NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

14-P-1707                                     Appeals Court


        JOHN DUFFY, D.C.  vs.  AMICA MUTUAL INSURANCE CO.


                      No. 14-P-1707.

        Middlesex.     January 11, 2016. - April 8, 2016.

          Present:  Katzmann, Milkey, & Hanlon, JJ.



Insurance, Motor vehicle personal injury protection benefits,
     Coordination-of-benefits clause, Unfair act or practice.
     Contract, Insurance, Coordination of benefits clause.
     Consumer Protection Act, Insurance.




        Civil action commenced in the Lowell Division of the
District Court Department on May 14, 2010.

        The case was heard by J. Elizabeth Cremens, J., on motions
for summary judgment.


        Francis A. Gaimari for the plaintiff.
        Charles G. Devine, Jr. for the defendant.


        KATZMANN, J.  This appeal presents the principal question

whether summary judgment was appropriately allowed against a

health care provider which, though having failed to coordinate

benefits between the insured's auto insurer and the insured's

health insurer, claimed entitlement to unpaid Personal Injury

Protection (PIP) benefits under the compulsory motor vehicle liability insurance scheme contained in G. L. c. 90, §§ 34A-34Q.[1]

The plaintiff, John Duffy, D.C., a corporation providing chiropractic services (we refer to the corporation and the individual as Duffy),[2] appeals from a decision and order of the Appellate Division of the District Court affirming a summary judgment granted by a District Court judge to the defendant, auto insurer Amica Mutual Insurance Company (Amica), on Duffy's action for recovery of $394.44 in PIP benefits. Duffy had treated Amica's insured, Sandra Cormier, and he alleges that the PIP benefits were due him as an unpaid party pursuant to G. L.

---

[1] Under that scheme, designed in large part to "provide an inexpensive and uncomplicated procedure for obtaining compensation for injuries sustained in automobile accidents," Dominguez v. Liberty Mut. Ins. Co., 429 Mass. 112, 115 (1999), "the first $2,000 of accident-related medical bills are covered by the automobile insurer under PIP; medical bills from $2,000 to $8,000 are also payable under PIP if the injured party does not have private health insurance. . . . [A]n automobile insurer is not required to pay for medical expenses between $2,000 and $8,000 as PIP benefits if the claimant's health insurer would have covered the medical services had the claimant sought treatment in accordance with his health insurer's plan." Mejia v. American Cas. Co., 55 Mass. App. Ct. 461, 462 n.2 (2002). See note 6, infra.

[2] Although the complaint was filed by the corporation, the chiropractic services were alleged to have been provided by the individual, John Duffy, and the briefs refer to him in his individual capacity with respect to the facts underlying this case. We do likewise.

c. 90, § 34M.[3]  He also claims that he was entitled to recover

damages and attorney's fees and costs pursuant to G. L. c. 90,

§ 34M, and G. L. c. 93A, § 11.[4]  We affirm.

Discussion.  "We review the disposition of a motion for

summary judgment de novo . . . to determine whether all material

facts have been established such that the moving party is

entitled to judgment as a matter of law[;] . . . [w]e construe

all facts in favor of the nonmoving party, . . . and we may

consider any grounds that support the motion judge's ruling."

American Intl. Ins. Co. v. Robert Seuffer GmbH & Co. KG., 468

---

[3] General Laws c. 90, § 34M, fourth par., as amended by St.
1972, c. 313, provides, in relevant part:

> "Personal injury protection benefits and benefits due
> from an insurer assigned shall be due and payable as loss
> accrues, upon receipt of reasonable proof of the fact and
> amount of expenses and loss incurred provided that upon
> notification of disability from a licensed physician, the
> insurer shall commence medical payments within ten days or
> give written notice of its intent not to make such
> payments, specifying reasons for said nonpayment . . . .
> In any case where benefits due and payable remain unpaid
> for more than thirty days, any unpaid party shall be deemed
> a party to a contract with the insurer responsible for
> payment and shall therefore have a right to commence an
> action in contract for payment of amounts therein
> determined to be due in accordance with the provisions of
> this chapter."

[4] Duffy brought a four-count complaint against Amica.  Count
I alleged a violation of G. L. c. 90, § 34M.  Duffy also appeals
from the grant of summary judgment on count II, which alleged a
violation of G. L. c. 93A, § 11, predicated on the § 34M
violation.

Mass. 109, 113, cert. denied, 135 S. Ct. 871 (2014) (quotations and citations omitted).

The essence of the parties' dispute is the question whether Amica's obligation to pay unpaid portions of Duffy's bills was ever triggered. Amica initially denied all payments to Duffy in September and October, 2005, on the basis of an independent medical examination (IME)[5] conducted by an orthopedic surgeon, which indicated that Cormier would not need further professional medical care beyond a date roughly one month before she began treatment with Duffy. Although the initial $2,000 in PIP benefits available under the insurance contract[6] had also already

---

[5] See G. L. c. 90, § 34M, third par., inserted by St. 1970, c. 670, § 4, which provides, in pertinent part:

"The injured person shall submit to physical examinations by physicians selected by the insurer as often as may be reasonably required."

[6] Consistent with G. L. c. 90, § 34A, Amica's PIP benefit is governed by a contract provision that limits Amica's obligation to pay medical expenses in excess of $2,000. Under this provision, medical expenses in excess of $2,000 must first be submitted to the injured person's health insurer, if any, to determine what the health plan will pay. See G. L. c. 90, § 34A, fourth par., inserted by St. 1988, c. 273, § 16, which provides in pertinent part:

"[P]ersonal injury protection provisions shall not provide for payment of more than two thousand dollars of expenses incurred within two years from the date of accident for medical, surgical, X-ray and dental services, including prosthetic devices and necessary ambulance, hospital, professional nursing and funeral services if, and to the extent that, such expenses have been or will be compensated, paid or indemnified pursuant to any policy of

been exhausted at this point, Amica did not directly so inform Duffy. However, Amica had previously advised Cormier and her counsel of this development on July 22, 2005, one month before Cormier began treatment with Duffy.

1. Coordination of benefits. Quite apart from its reliance on the IME as a basis for denying payment to Duffy, Amica contends that its duty to pay Duffy was never triggered in any event because Duffy failed to coordinate benefits between Amica and Cormier's health insurer. See note 1, supra; Dominguez v. Liberty Mut. Ins. Co., 429 Mass. 112, 115 (1999) ("[G. L. c. 90, §] 34A, by it terms, expresses a legislative recognition that available health insurance reduces the cost of motor vehicle insurance by eliminating the need for additional PIP coverage, and codifies a legislative mandate that claimants utilize existing health insurance for medical expenses which exceed the $2,000 limit on an automobile insurer's PIP liability"); Mejia v. American Cas. Co., 55 Mass. App. Ct. 461, 462 n.2, 466 (2002). Duffy counters that Amica did not advise him directly in 2005 that the initial $2,000 in PIP benefits had been exhausted and so Amica is estopped from relying on any

---

health, sickness or disability insurance or any contract or agreement of any group, organization, partnership or corporation to provide, pay for or reimburse the cost of medical, hospital, dental or other health care services."

alleged failure to coordinate benefits.  Duffy's arguments are unavailing.

The summary judgment record unequivocally demonstrates Duffy's actual notice by July, 2006, at the latest, that Cormier's initial $2,000 in PIP benefits had been exhausted.[7]  He therefore knew long before filing suit in May, 2010, that, even if Amica's reliance on the IME to deny coverage could be shown to be invalid, he would nonetheless still first have to submit his bills to the health insurer and then resubmit any unpaid balances to Amica before the latter would have any obligation to pay notwithstanding the IME.  In fact, Duffy did ultimately receive $892.91 in partial payment of his bills from Cormier's health insurer in August, 2006.  In August, 2007, Duffy received an additional $1109.90 in partial payment from proceeds of Cormier's settlement with a third party.[8]  Duffy never resubmitted to Amica a request for the $394.44 that remained

---

[7] In a letter dated July 17, 2006, Duffy's billing service sent a letter to Cormier's health insurer seeking reimbursement for services rendered to Cormier, and attaching a letter from Amica to Cormier's attorney dated June 15, 2006, advising that $2,000 in PIP benefits had been paid, and that Cormier should, henceforward, submit outstanding bills to her health insurer.

[8] Duffy also asserts that, standing in Cormier's shoes, he is entitled to trial on the merits with respect to this amount as well.  We need not address this argument, given the result we reach.

outstanding, nor did he provide Amica with documentation of the health insurer's payments or his receipt of settlement proceeds.

Contrary to Duffy's estoppel theory, Amica's initial reliance on an IME cutoff to refuse payment to Duffy does not preclude Amica's assertion of a defense of failure to coordinate benefits. "[T]he mere statement of one ground for denying liability without explanatory words or circumstances does not warrant the inference of an intention to relinquish other defences." Royal-Globe Ins. Co. v. Craven, 411 Mass. 629, 635 (1992) (Royal-Globe), quoting from Sheehan v. Commercial Travelers' Mut. Acc. Assn., 283 Mass. 543, 552 (1933). Duffy was on actual notice of the coordination of benefits requirement no later than July, 2006 -- a point in time still well within the two years allowed for the presentation of PIP claims under the statute[9] -- and yet he still failed to coordinate benefits. He then waited nearly an additional four years to bring this action. It is therefore difficult to see how Duffy can claim that Amica's conduct induced him "to do something different from

---

[9] Cormier's automobile accident occurred on April 17, 2005. General Laws c. 90, § 34M, third par., provides that

> "[c]laim[s] for benefits due under the provisions of personal injury protection or from the insurer assigned shall be presented to the company providing such benefits as soon as practicable after the accident occurs from which such claim arises, and in every case, within at least two years from the date of accident."

what otherwise would have been done and which has resulted to his harm." Royal-Globe, 411 Mass. at 635 (citation omitted). Duffy's estoppel argument therefore fails.[10] Ibid.

Duffy's claim that it would have been futile to send documentation concerning health insurance payments and coordination of benefits to Amica ignores the fact that without that information Amica would have had no way of knowing in 2006 (i) that Duffy was still claiming PIP benefits from the previous year at all, or (ii) whether it had any obligation to pay any unpaid balance left by the health insurer. Duffy cannot maintain that he could rely on bills he previously submitted to Amica for payment in full as, without any documentation on the partial payments he received subsequently, Amica could have made substantial overpayments to him if it had conceded coverage. See, e.g., Shah v. Liberty Mut. Ins. Co., 56 Mass. App. Ct. 903, 903 (2002) (after the first $2,000 in PIP benefits had been paid, provider was not entitled to "balance bill" PIP insurer to cover the difference between her usual charge for services and amount received from insured's health insurer pursuant to a

---

[10] Milton Ice Co. v. Travelers Indemnity Co., 320 Mass. 719 (1947), cited by Duffy, does not require a contrary conclusion here where the record demonstrates that Duffy had actual notice that benefits had to be coordinated while there was still ample time under the statute for him to do so. See Jimmy's Diner, Inc. v. Liquor Liab. Joint Underwriting Assn. of Mass., 410 Mass. 61, 63 n.3 (1991).

participating provider contract).  Amica would have also needed

documentation concerning the third-party settlement payment

Duffy received where Amica's contract with Cormier specified

that it "will not pay PIP benefits to or for an injured person,

to the extent those benefits would duplicate expenses or losses

recovered by that person in a court judgment or settlement."[11]

In fact, Amica did not learn of any of the partial payments

Duffy received until the discovery process in the instant

litigation.

The undisputed facts on the summary judgment record

therefore demonstrate that Duffy failed to comply with his

obligation to coordinate benefits and, consequently, Amica's

obligation to pay never actually arose.  While this conclusion

should be sufficient to resolve the present appeal, where Duffy

contends that Amica's denial letters themselves violated the

---

[11] See G. L. c. 90, § 34M, second par., inserted by St. 1970, c. 670, § 4, which provides in pertinent part:

"[I]f any person claiming or entitled to benefits under the personal injury protection provisions of a policy or bond insuring a vehicle registered in this commonwealth brings, in such a case, an action in tort against the owner or person responsible for the operation of such a vehicle, amounts otherwise due such a person under the provisions of section thirty-four A shall not become due and payable until a settlement is reached or a final judgment is rendered in such a case and the amounts then due shall be reduced to that extent that damages for expenses and loss otherwise recoverable as a personal injury protection benefit are included in any such settlement or judgment."

statute, we consider whether any initial violation by Amica effectively suspended Duffy's obligation to coordinate benefits.

2. IME cutoff denials. Duffy insists that even if he had a coordination of benefits obligation, Amica violated the statute and breached the insurance contract before that obligation arose by not including the exhaustion of the initial $2,000 as one of its reasons for nonpayment within ten days of his claim and instead relying exclusively on the IME cutoff. However, where it is undisputed that Amica provided Duffy with "written notice of its intent not to make [medical] payments" and "specif[ied] reasons for said nonpayment," G. L. c. 90, § 34M, fourth par., we do not agree that Amica violated the statute. We decline Duffy's invitation to read into the statute a requirement that the insurer specify all reasons it may have for nonpayment in the written notice where the reason(s) given were never contested prior to litigation. See Boone v. Commerce Ins. Co., 451 Mass. 192, 199 (2008), quoting from Dartt v. Browning-Ferris Indus., Inc. (Mass.), 427 Mass. 1, 9 (1998) ("[W]e will not add to a statute a word that the Legislature had the option to, but chose not to, include").

Duffy points out that the form denial letters he received from Amica contain a line that the claims handler could have simply checked to indicate to him that the $2,000 PIP threshold had been reached. However, a denial based on the initial PIP

threshold is only a conditional denial. That is, if the only reason for nonpayment is that the first $2,000 in benefits has been exhausted, an insurer might yet have a continuing coverage obligation to the claiming provider. (See, e.g., notes 1 and 6, supra.) Not so when an insurer denies coverage on the basis of an IME that indicates that the claiming provider's treatment was not medically necessary. The IME cutoff, unless refuted, would be an absolute denial of coverage for Duffy's treatment. Therefore, Duffy was well advised that before any of his bills could be considered for payment, he would need to refute the opinion in the IME report. See, e.g., Barron Chiropractic & Rehabilitation, P.C. v. Norfolk & Dedham Group, 469 Mass. 800, 802 (2014) (provider submitted expert response to IME, expressing different opinion as to when insured had reached medical end result). This he did not do. Here, Amica had already provided Cormier's counsel with the IME before Duffy ever began treating Cormier. The summary judgment record shows that Duffy had contact information for Cormier's counsel and was invited to contact Amica in each of the four denial letters he received. There is no evidence in the record that Duffy ever challenged the substance of the IME cutoff to put Amica on notice that it needed to do anything further to evaluate his claims for payment.

Duffy contends that the IME report did not state a definitive conclusion that Cormier had reached a medical endpoint but only a prediction that she would reach such an endpoint in four weeks. He argues that where the statute allows insurers to have independent physical examinations performed "as often as may be reasonably required," G. L. c. 90, § 34M, third par., Amica's duty of good faith required it to reexamine Cormier before denying his bills for payment. He disputes that under the circumstances here Amica had no duty of investigation to determine the medical necessity of any post-IME medical treatment that Cormier received. We are not persuaded by Duffy's claims.

Imposing on auto insurers an obligation to automatically conduct an additional IME simply because a bill for subsequent treatment has been received would run contrary to one of the key legislative purposes underlying enactment of § 34M: "to control costs of compulsory automobile insurance." Dominguez, 429 Mass. at 115.[12]

---

[12] Duffy also points to statutory language that requires PIP insurers in certain circumstances to submit any bill for which payment has been refused to "at least one practitioner registered or licensed under the same section of chapter one hundred and twelve as the practitioner who submitted the bill for medical services." G. L. c. 90, § 34M, fourth par., as amended through St. 1989, c. 271. Although the statutory language quoted by Duffy indicates that denials based on a "medical review" must be submitted for review by a practitioner registered or licensed under the same section of G. L. c. 112 as

Furthermore, Duffy's arguments are fatally flawed as applied to the undisputed facts of this case. First, the IME report stated explicitly that Cormier would have a decreasing partial disability for the next four weeks. The existence of symptoms after that point would not, on its own, have indicated to Amica that the conclusions in the IME report were incorrect,[13] as the IME explicitly anticipated that Cormier's symptoms would remain, but determined that "the remainder of her symptoms can be handled by a home exercise program."

While Amica could have requested that Cormier submit to a fresh independent medical examination, Duffy has not shown that Amica was required to do so here where (i) it possessed a recent

the claiming practitioner, no such requirement applies where, as here, a physical examination of the claimant was conducted, rather than merely a review of the medical bills and services underlying those bills. See Boone, 451 Mass. at 196. Thus, the statute does not preclude Amica's reliance on the preexisting IME conducted by an orthopedic surgeon. See id. at 197 n.6 ("[A]llowing insurers to deny payments for medical services where the denial is based on an IME by a medical practitioner in a specialty different from the treating or billing practitioner is consistent with the legislative goal of controlling costs and ensuring timely payments of medical bills").

[13] We do not reach the questions whether the opinions expressed in the IME report were actually correct or whether Duffy's treatment of Cormier was medically necessary and causally related to the accident, the resolution of which would be beyond the scope of the summary judgment decision before us. Our analysis is limited to whether the summary judgment record demonstrates that Amica's reliance on the IME to deny coverage was a violation of § 34M that would excuse Duffy from his obligation to coordinate benefits. For the reasons we discuss in the main text, we are not persuaded that it was.

IME report by a reviewing physician with at least as much training and education as Duffy, the claiming provider, see Boone, 451 Mass. at 198; (ii) the IME supported the denial of coverage; and (iii) Duffy never challenged the IME. The simple fact that Amica received medical bills from Duffy, then a new provider on the case, would not put it on notice that the IME required updating, especially where the actual opinion in the IME report was not that the symptoms would have disappeared but only that any remaining symptoms could be managed with a home exercise program after four more weeks. See Brito v. Liberty Mut. Ins. Co., 44 Mass. App. Ct. 34, 37 (1997) ("The insurer is not required to pay unexplained medical bills merely on the unsubstantiated assertion by the claimant that they represent reasonable and necessary treatment for injuries caused by the accident"). The denial letters it did send at least "impliedly invited" a response from Duffy, but none was ever received. Washington v. Metropolitan Life Ins. Co., 372 Mass. 714, 719 (1977).[14]

---

[14] Duffy's reliance on Washington v. Metropolitan Life Ins. Co., 372 Mass. 714 (1977), for the proposition that Amica had an affirmative duty of further inquiry with respect to coordination of benefits is unavailing when applied in the context of the refusal based on the IME. In Washington, the court acknowledged that "an insurer may have a good faith duty in particular circumstances to request additional information." 372 Mass. at 719. However, this duty can be satisfied in part by "inviting the submission of further information in support of the claimant's position." Ibid. Moreover, on the facts in

Although Duffy is correct that insurers must operate in good faith, he too must act in good faith. When confronted with a denial based on an IME and with contact information for both the claims handler and the insured's counsel, good faith required Duffy to take at least some action to ascertain and, if necessary, challenge the validity of the denial before filing suit nearly five years later. See Dominguez, 429 Mass. at 118 (concluding that the claimant was not entitled to recover medical expenses above $2,000 from the PIP insurer where, inter alia, he failed "to cooperate and deal in good faith" with both the health insurer and the PIP insurer).

Where it is undisputed that Duffy did nothing to alert Amica that he objected to denial of his bills on the basis of the IME's determination in 2005 and then failed to resubmit unpaid portions of his bills to Amica after partial payments by Cormier's health insurer in 2006, Duffy has not shown a violation of G. L. c. 90, § 34M, and judgment in favor of Amica on count I was appropriate as a matter of law. Therefore,

---

Washington, the court concluded that the insurer had "no obligation to state affirmatively that additional proof might have been submitted" because, among other things, none of the facts submitted by the claimant indicated that the medical opinion the insurer had already seen was in error and the insurer's letters to the claimant not only did not foreclose the submission of additional information but also "impliedly invited the submission of additional proof." Ibid. Similar reasoning applies here.

because Duffy's G. L. c. 93A claim asserted in count II was predicated on the alleged § 34M violation, it, too, must fail.[15] See <u>Donovan</u> v. <u>Philip Morris USA, Inc</u>., 455 Mass. 215, 227 n.13 (2009) (c. 93A claims "based on the same theory of injury and the same set of alleged facts" as underlying claims "survive or fail under the same analysis as the underlying . . . claim").

<u>Decision and order of the Appellate Division affirmed</u>.

---

[15] Duffy's request for attorney's fees and costs is denied.